An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-1056

Filed 15 July 2026

Iredell County, No. 23JA000289-480

IN THE MATTER OF: R.E., a minor child.

Appeal by Respondent-Mother from order entered 8 August 2025 by Judge Thomas R. Young in Iredell County District Court. Heard in the Court of Appeals 20 May 2026.

> *Lauren Vaughan for Petitioner-Appellee Iredell County Department of Social Services.*
>
> *Rebekah W. Davis for Respondent-Appellant Mother.*
>
> *Administrative Office of the Courts, by GAL Staff Attorney Brittany T. McKinney, for guardian ad litem.*

GRIFFIN, Judge.

Respondent-Mother appeals an order changing the custody of her daughter, Ruth.[1] Respondent-Mother argues "[t]he permanency planning order did not address all of the requirements of N.C.G.S. §§ 7B-906.1 and 7B-906.2" and "findings and the evidence did not support the placement of Ruth in the legal and physical custody of

---

[1] We use a pseudonym to protect the anonymity of the juvenile and for ease of reading. *See* N.C. R. App. P. 42(b).

Ms. Heggins[;]" thus, "[t]he trial court's custody determination was an abuse of discretion." She also argues "[t]he provisions for visitation between [Respondent-]Mother and Ruth were not supported by findings or evidence" and "[t]he visitation plan was contrary to the best interests of Ruth, and it was an abuse of discretion."

We affirm the trial court's order in part, vacate the portion of the order requiring supervised visits by Pharos at Respondent-Mother's cost, and remand for additional findings of fact addressing whether Respondent-Mother has the ability to pay those costs and for correction of the clerical error in Finding of Fact 23.

## I.    Factual and Procedural Background

Ruth was born to Respondent-Mother on 15 April 2018. In 2018, Respondent-Mother completed a Parental Capacity Assessment, which determined she did "not present with sufficiently strong personal or mental health functioning to be capable of meeting all the demands involved in parenting a child," and she was diagnosed with "historic personality disorder, borderline personality disorder[,] and alcohol use disorder, severe."

On 30 May 2023, Iredell County Department of Social Services[2] ("DSS") received a report "alleging neglect due to improper discipline without injuries, improper care, and lack of supervision" for Ruth and her brother who both resided with Respondent-Mother at the time. These reports stemmed from altercations

---

[2] Respondent-Mother previously had three older children removed from her by Rowan County DSS due to "domestic violence, substance abuse[,] and untreated emotional/mental health issues."

between Respondent-Mother and her son and Ruth's brother, Chip.[3] In one altercation, Respondent-Mother and Chip got into an argument around 8:00 P.M. when Respondent-Mother said if he left to go to the store he would not be let back into the house, and Respondent-Mother alleged Chip had physically attacked her and threatened her; after which, Chip went to the store, and Respondent-Mother locked him out of the house.

At another time, Respondent-Mother stated Chip had jumped out of the car while Respondent-Mother was driving, and when she attempted to get him back into the car, "he started hitting her, busted her lip, and left a bump on her head." Chip admitted to threatening and assaulting Respondent-Mother several times as well as being aggressive to his sister, Ruth.

DSS and Respondent-Mother entered into a safety plan, and on 14 July 2023 DSS began providing family In-Home Case Management Services, with Respondent-Mother and Chip receiving Child Focused Assertive Community Treatment Team services through Children's Hope Alliance. However, the verbal and physical altercations between Respondent-Mother and Chip continued. On 3 September 2023, Chip assaulted Respondent-Mother and was involuntarily committed until 15 September 2023, when he was discharged. After another physical altercation between Respondent-Mother and Chip, DSS expressed its concern to Respondent-

---

[3] A pseudonym. *See* N.C. R. App. P. 42(b).

Mother about Ruth's safety because of her exposure to the altercations and requested Respondent-Mother make a plan for Ruth in the meantime, to which Respondent-Mother expressed Ruth was safe and refused to make a plan. On 9 November 2023, Ruth was present for another altercation during which Chip attacked Respondent-Mother.

Based on this background, DSS filed petitions alleging neglect and dependency for both Chip and Ruth on 22 December 2022. DSS was granted nonsecure custody on 28 December 2023, and the children were placed with Ruth's paternal aunt, Ms. Heggins. On 14 March 2024, the children were adjudicated neglected.

In its 8 May 2024 disposition order, the trial court found Respondent-Mother did not take any personal responsibility for why the juveniles had been removed from her home but "engaged with a case plan[;]" "engaged with mental health therapy[;]" and "is visiting the juveniles." Respondent-Mother was ordered to remedy the conditions of the home by, *inter alia*, complying with the terms of the case plan, submitting to mental health and substance abuse assessments, maintaining consistent employment and a verifiable income source, and completing a psychiatric assessment if recommended by her treatment provider.

The trial court granted Respondent-Mother a minimum of two hours each week of supervised visitation with Ruth. Respondent-Mother filed a notice of appeal of both the adjudication and disposition orders on 7 and 27 June 2024.

The trial court held the first permanency planning hearing for the children on 20 October 2024. Respondent-Mother had engaged with a case plan and was "working on it[,]" engaged with mental health therapy, and visited the children. The children still resided with Ms. Heggins. Ms. Heggins was "ready for the children to go back to their mom[,]" but requested that Chip be relocated sooner if reunification was not imminent. The trial court authorized a trial home placement for the children over the next three to four weeks.

The trial home placement commenced in early November 2024 but quickly "began to fall apart." Respondent-Mother stopped attending her mental health treatment from October to late January. She allowed Ruth to have unsupervised overnight visits with Ruth's father, which had been precluded by the trial court. Respondent-Mother allowed a convicted felon to reside in her home during the trial home placement. After an argument with Chip while she was impaired, Respondent-Mother left Chip home alone for several days. Finally, Respondent-Mother, while impaired, drove Ruth to Ms. Heggins's home and "started an argument . . . and damaged property at [Ms. Heggins's] home." Law enforcement responded and forbade Respondent-Mother from driving due to her intoxication. The next day, DSS visited Respondent-Mother's home and found Ruth ill and Respondent-Mother in "a loud argument with her mother over the phone." Ruth told the social worker that she wanted to leave and stay with Ms. Heggins. Ruth returned to live with Ms. Heggins,

and Chip was placed with Ruth's paternal grandmother, whom Chip considers to be a relative.

At the subsequent permanency planning hearing on 25 February 2025 and in the related 5 March 2025 order, the trial court found reunification with the Respondent-Parents would be "unsuccessful or inconsistent" with the health and safety of the children and the necessity of a safe, permanent home. The trial court found DSS had made reasonable efforts towards reunification, "but should be relieved of further efforts." The primary permanent plan for the children shifted to "[c]ustody to a relative or other suitable person" with a secondary plan of adoption. Respondent-Mother was again entitled to at least two hours of weekly supervised visits with the children.

On 2 April 2025, this Court affirmed the adjudication of the children as neglected juveniles and the subsequent disposition granting legal and physical custody of the children to DSS.

Ruth continued to reside with Ms. Heggins and was "doing well in her home." Ms. Heggins desired to be Ruth's primary custodian. Chip resided in a level III placement but ran away for about two weeks before Respondent-Mother picked him up from the police. Chip refused to attend the permanency planning hearing on 23 July 2025, and law enforcement was called to make him attend. Respondent-Mother was employed at Family Dollar and renewed her CNA license. She attended therapy and visited Ruth weekly. The trial court held a permanency planning hearing on 23

July 2025 and made the following findings of fact in its 8 August 2025 order, in relevant part:

> 5. The Iredell County Department of Social Services ("DSS") has made reasonable efforts to reunify and to eliminate the need for placement of the juvenile outside of the juvenile's own home and should continue to do so. Said efforts are as described in the social worker's report and the prior court orders.
>
> . . . .
>
> 8. The juvenile, [Ruth], is placed with her paternal aunt, Angela Heggins, in Spencer. Ms. Heggins has been taking good care of the juvenile. The juvenile is doing well in her home. Angela Heggins is specifically approved to continue to provide care for [Ruth]. She has demonstrated for more than six months that she has the ability to provide for the juvenile's needs. She desires to be the permanent custodian of [Ruth].
>
> . . . .
>
> 10. . . . [Chip] stayed in [Respondent-Mother's] home overnight and then refused to come to court with her today. [Respondent-Mother] resorted to calling law enforcement to get the juvenile to comply.
>
> . . . .
>
> 15. At this time, efforts to reunite the juvenile with the Respondent Parents would be clearly unsuccessful or inconsistent with the juvenile's health and safety and need for a safe, permanent home within a reasonable period of time.
>
> 16. DSS has made reasonable efforts to implement the primary and secondary permanent plans for the juvenile. Said efforts are as described in the social worker's report and the prior court orders.

17. All of the same issues that were present when the juveniles were adjudicated neglected continue to exist. . . . . [Respondent-Mother] has sporadic mental health treatment; she is unable to control [Chip]; she makes meritless reports and complaints about caretakers and burns bridges for placements and help; and she exhibits behaviors and conduct demonstrating her mental health issues persist.

. . . .

22. At this time, it no longer remains possible for the juveniles to be placed with a parent within the next six months.

23. Based on the Respondent Parents' failure to make sufficient, timely progress in addressing the issues that caused the juvenile to enter the purview of the court and foster care, the termination of parental rights should be considered. Presently, the filing of a petition or motion to terminate parental rights would be inconsistent with the juvenile's best interest, as there persists the possibility that the parent-child relationship can be maintained through guardianship with a relative.

24. Information regarding the visitation that has occurred is contained in the social worker's and the GAL's reports. There is a need to create, modify, or enforce an appropriate visitation plan in accordance with N.C.G.S. § 7B-905.1.

25. Information regarding the placement(s) the juvenile has had is contained in the social worker's report, the GAL's report, and the prior court orders. The juvenile's current placement with Angela Heggins is appropriate and should continue.

26. The goals of the juvenile's foster care plan include, but are not limited to, providing the juvenile with a safe, nurturing environment in which to reside while the Respondent Parents are working to rectify the issues that

caused the juvenile to enter the purview of the court and foster care and until such time as permanency can be achieved. The juvenile's current placement provider will be consulted about the juvenile's ongoing needs and the placement provider's desire and ability to provide permanency for the juvenile. Further, the placement provider will be involved in transitioning the juvenile towards permanency.

. . . .

31. Presently, the juvenile requires more adequate care or supervision than the Respondent Parents can provide, and return to the juvenile's own home would be contrary to the juvenile's health and safety.

The trial court concluded the best permanent plan for Ruth was "a plan of [c]ustody to a relative or other suitable person." Legal and physical custody of Ruth was given to Ms. Heggins. Respondent-Mother was entitled to a minimum of one two-hour visit with Ruth per week. The trial court ordered the visits to be supervised by Pharos Parenting at Respondent-Mother's cost or by someone approved by Ms. Heggins. The supervisor was authorized to end the visit if Respondent-Mother presented as visibly impaired, behaved in a manner that presented a danger to Ruth, or was visibly upsetting to Ruth. Only people approved by Ms. Heggins in advance were permitted to participate in the visitation. Finally, the trial court ordered Respondent-Mother shall contact Ms. Heggins twenty-four hours before each visit to confirm attendance or the visit would not occur. Respondent-Mother provided timely notice of appeal on 28 August 2025.

## II.    Analysis

Respondent-Mother solely appeals the order as it pertains to Ruth and presents two issues on appeal: (1) "The permanency planning order did not address all of the requirements of N.C.G.S. §§ 7B-906.1 and 7B-906.2. Additionally, the findings and the evidence did not support the placement of Ruth in the legal and physical custody of Ms. Heggins. The trial court's custody determination was an abuse of discretion." (2) "The provisions for visitation between [Respondent-]Mother and Ruth were not supported by the findings or evidence. The visitation plan was contrary to the best interests of Ruth, and it was an abuse of discretion." We affirm the trial court in part, vacate in part, and remand in part solely for additional findings of fact addressing whether Respondent-Mother has the ability to pay visitation costs and for correction of the clerical error.

## A. Statutory Requirements and Findings of Fact

Respondent-Mother first argues "[t]he permanency planning order did not address all of the requirements of N.C.G.S. §§ 7B-906.1 and 7B-906.2. Additionally, the findings and the evidence did not support the placement of Ruth in the legal and physical custody of Ms. Heggins." Therefore, according to Respondent-Mother, "the trial court's custody determination was an abuse of discretion."

"Our review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings of fact and whether the findings support the conclusions of law. The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *In re L.R.L.B.*, 377

N.C. 311, 315, 857 S.E.2d 105, 111 (2021) (citation modified). Competent evidence may consist of "any evidence, including hearsay evidence . . . or testimony or evidence from any person that is not a party, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen. Stat. § 7B-906.1(c) (2025). Moreover, "the trial judge's decisions as to the weight and credibility of the evidence, and the inferences drawn from the evidence are not subject to appellate review." *In re D.W.P*, 373 N.C. 327, 330, 838 S.E.2d 396, 400 (2020) (citation omitted).

### 1. N.C. Gen. Stat. § 7B-906.1

#### a. N.C. Gen. Stat. § 7B-906.1(d)(3)

Respondent-Mother argues that Findings 15, 17, and 31 are "findings described in" and using the same language as subsection 7B-906.1(d)(3). Respondent-Mother also argues these findings do not address Respondent-Mother and Ruth, but rather Respondent-Mother and Chip. N.C. Gen. Stat. § 7B-906.1(d) details criteria the trial court should consider at a permanency planning hearing and mandates written findings regarding relevant criteria. N.C. Gen. Stat. § 7B-906.1(d) (2025). One of those criteria, subsection 7B-906.1(d)(3), is "whether efforts to reunite the juvenile with either parent clearly would be unsuccessful or inconsistent with the juvenile's health or safety and need for a safe, permanent home within a reasonable period of time." N.C. Gen. Stat. § 7B-906.1(d)(3) (2025).

DSS argues similar findings in the 5 March order ceased the reunification plan, and therefore this issue was settled by the Court. Accordingly, the GAL argues the findings reiterated in the order on appeal are no longer statutorily relevant. Regardless, presuming arguendo the arguments are preserved and relevant, the findings of fact are supported by competent evidence.

Findings 15, 17, and 31, state,

> 15. At this time, efforts to reunite the juvenile with the Respondent Parents would be clearly unsuccessful or inconsistent with the juvenile's health and safety and need for a safe, permanent home within a reasonable period of time.

> 17. All of the same issues that were present when the juveniles were adjudicated neglected continue to exist. . . . . [Respondent-Mother] has sporadic mental health treatment; she is unable to control [Chip]; she makes meritless reports and complaints about caretakers and burns bridges for placements and help; and she exhibits behaviors and conduct demonstrating her mental health issues persist.

> 31. Presently, the juvenile requires more adequate care or supervision than the Respondent Parents can provide, and return to the juvenile's own home would be contrary to the juvenile's health and safety.

Here, the trial court admitted the reports of both the social worker and the GAL into evidence, incorporated them by reference into the findings of fact, and took judicial notice of prior orders entered in this matter. The 22 January 2025 DSS court report indicated Respondent-Mother "ha[d] not consistently attended therapy" and Respondent-Mother's therapist indicated her participation in treatment "has had

some breaks but has been consistent overall." She stopped attending mental health treatment from October 2024 to late January 2025. Therefore, there is competent evidence to support Respondent-Mother has sporadic mental health treatment.

Further, Ms. Heggins and Respondent-Mother "ha[ve] a lot of conflict sometimes." Respondent-Mother has engaged in "constant criticism of [Ms. Heggins's] caretaking skills" that has prevented a cordial relationship. Moreover, Respondent-Mother filed a report with Rowan County DSS alleging that Chip was being abused by his caretaker. The caretaker was wheelchair bound and had just left a Nursing Rehabilitation Facility. While the record does not indicate the outcome of the allegation, Rowan County DSS spoke with the caretaker and engaged the social worker. Therefore, there is competent evidence to support that Respondent-Mother has made meritless reports and complaints about caretakers and burns bridges for placements and help.

Finally, Respondent-Mother "has displayed continued mental health and substance abuse issues during th[e] review period," placing the juveniles in potential harm. She allowed a convicted felon to stay in her home during the trial home placement; she left Ruth and Chip in the care of others; she allowed Ruth to have unsupervised overnight visits with Respondent-Father in violation of the trial court's direction; she "ha[d] been engaging in erratic behaviors such as arguing with neighbors and others in the presence of the juveniles;" and she drove while impaired with Ruth in the car. Respondent-Mother started an argument with Ms. Heggins and

damaged property at Ms. Heggins's home. This is competent evidence to support finding Respondent-Mother's mental health issues continue and Findings 15 and 31 in general.

Respondent-Mother also argues that Finding of Fact 10, specifically that Respondent-Mother "resorted" to calling law enforcement to bring Chip to court for the permanency planning hearing on 23 July 2025, is "inaccurate and unnecessary." Respondent-Mother contends she was calm in an otherwise problematic situation, and no caretaker could have controlled Chip. While the responding officer did describe Respondent-Mother as "calm and collected," she was also "pleading" to get Chip to come to court and sat outside the door, "kind of waiting for things to play out." Thus, there is competent evidence to support that Respondent-Mother is unable to control Chip, which supports that "[a]ll of the same issues that were present when the juveniles were adjudicated neglected continue to exist" and "efforts to reunite [Ruth] with either parent clearly would be unsuccessful or inconsistent with the juvenile's health or safety and need for a safe, permanent home within a reasonable period of time." N.C. Gen. Stat. § 7B-906.1(d)(3).

   b. *N.C. Gen. Stat. § 7B-906.1(e)*

Respondent-Mother argues that Findings 16, 22, 23, and 25[4] correspond to subsection 7B-906.1(e) and lacked specificity or basis for the finding. Subsection 7B-906.1(e) details additional criteria that the court should consider when the juvenile is not placed with the parent. N.C. Gen. Stat. § 7B-906.1(e) (2025). These criteria are, in relevant part:

> (1) Whether it is possible for the juvenile to be placed with a parent within the next six months and, if not, why such placement is not in the juvenile's best interests.
>
> (2) Where the juvenile's placement with a parent is unlikely within six months, whether legal guardianship or custody with a relative or some other suitable person should be established and, if so, the rights and responsibilities that should remain with the parents.
>
> . . . .
>
> (4) Where the juvenile's placement with a parent is unlikely within six months, whether the juvenile should remain in the current placement, or be placed in another permanent living arrangement and why.
>
> (5) Whether the county department of social services has since the initial permanency plan hearing made reasonable efforts to implement the permanent plan for the juvenile.
>
> (6) Any other criteria the court deems necessary.

N.C. Gen. Stat. § 7B-906.1(e). Only relevant criteria require findings under this subsection. *In re L.L.*, 386 N.C. 706, 713, 909 S.E.2d 151, 157–58 (2024). "The trial

---

[4] Apart from a sole initial citation to Finding 25 within a list of other findings, Respondent-Mother never mentions Finding 25 in the rest of her argument; thus, we do not address it in relation to N.C. Gen. Stat. § 7B-906.1(e).

court has discretion to determine which factors were relevant." *Id.* at 713, 909 S.E.2d at 158.

Finding 16 states DSS had made reasonable efforts to implement the primary and secondary plans for the juvenile as described in the social worker's report and prior court orders. "When trial courts incorporate documents by reference, the factual findings contained in those documents—but not their opinions or recommendations— become the findings of the trial court's order." *Id.* at 718, 909 S.E.2d at 160–61. Therefore, it is appropriate for the trial court to incorporate the social worker's report and prior court orders into the findings of fact, and there is competent evidence within those documents to support Finding 16.

Respondent-Mother further contends that Finding 22 only recites the possibility of placement with the parent. This finding of fact, however, is supported by Finding 17, which, as discussed above, is supported by competent evidence.

Respondent-Mother argues Finding 23 was inaccurate because the finding references guardianship instead of custody. In Finding 23, the trial court found "there persists the possibility that the parent-child relationship can be maintained through guardianship with a relative," which is in the juvenile's best interest. However, the trial court awarded Ms. Heggins legal and physical custody of Ruth, not guardianship. This appears to be a clerical error. *In re R.S.M.*, 257 N.C. App. 21, 23, 809 S.E.2d 134, 136 (2017) ("A clerical error is an error resulting from a minor mistake or inadvertence, especially in writing or copying something on the record,

and not from judicial reasoning or determination." (citation modified)). The term "guardianship" does not appear in any part of the order outside of Finding 23; rather, the term "custody" is used in Finding of Fact 32, Conclusion of Law 4, and the trial court's decree. This error does not negate the validity of the finding, and "may be addressed and corrected upon remand." *In re P.L.E.*, 290 N.C. App. 176, 181, 891 S.E.2d 613, 617 (2023).

    c. *N.C. Gen. Stat. § 7B-906.1(j)*

Respondent-Mother argues "[t]he N.C.G.S. § 7B-906.1(j) findings . . . were general and did not involve actual consequences or adequate resources" and challenges Findings 8 and 25. N.C. Gen. Stat. § 7B-906.1(j) mandates, if the court determines that the juvenile should be placed with a custodian or guardian other than the parent, "the court shall verify that the person receiving custody or being appointed as guardian . . . understands the legal significance of the placement or appointment and will have adequate resources to care appropriately for the juvenile." N.C. Gen. Stat. § 7B-906.1(j) (2025). The trial court is not required to "'make any specific findings in order to make the verification.'" *In re J.D.M.-J.*, 260 N.C. App. 56, 65, 817 S.E.2d 755, 761 (2018) (citation omitted). However, "the record must show the trial court received and considered reliable evidence that the guardian or custodian had adequate resources and understood the legal significance of custody or guardianship." *Id.* (citation omitted).

Stable placement of the juvenile with the prospective custodian or guardian for at least six consecutive months is evidence that the person has adequate resources. N.C. Gen. Stat. § 7B-906.1(j). Such evidence, however, "does not per se compel a conclusion that the 'person receiving custody . . . understands the legal significance of the placement.'" *In re A.J.J.*, 299 N.C. App. 616, 624, 919 S.E.2d 711, 717 (2025) (internal citation omitted). Evidence that a custodian understands the legal significance of the placement can include "testimony from the potential [custodian] of a desire to take [custody] of the child . . . and testimony from a social worker that the potential [custodian] was willing to assume legal [custody]." *In re E.M.*, 249 N.C. App. 44, 54, 790 S.E.2d 863, 872 (2016) (citation omitted).

Ruth has resided in Ms. Heggins's home from 3 February 2025 through the date of the permanency planning hearing, 23 July 2025. This is ten days under the six-month minimum. Before the trial home placement with Respondent-Mother, Ruth had resided with Ms. Heggins from 12 March 2024, at the latest, to the trial home placement, which began in early November 2024. The prior placement exceeded the consecutive six-month minimum. This indicates that Ms. Heggins has adequate resources to support Ruth.

Further, Ms. Heggins indicated she has adequate resources to support Ruth. Ms. Heggins testified that she has been able to pay rent and household bills during Ruth's placements, and can provide food, clothing, medical needs, appointments, and

schooling for Ruth. The social worker testified that, despite a lack of child support, Ms. Heggins has been able to "maintain the necessities" for herself and Ruth.

The social worker went on to testify that she spoke with Ms. Heggins about the legal and financial consequences of permanent custody, and Ms. Heggins seemed to understand the consequences. While Ruth does not have her own room nor her own bed, "our role on appeal is not to weigh and compare the evidence; our standard of review merely asks if there was competent evidence, even hearsay evidence, at trial to support the trial court's findings." *In re N.H.*, 255 N.C. App. 501, 507, 804 S.E.2d 841, 845 (2017). The statements from Ms. Heggins and the social worker are enough, when combined with the stable placement of Ruth with Ms. Heggins, to meet the statutory requirements of subsection 7B-906.1(j). *See In re K.P.*, 383 N.C. 292, 308, 881 S.E.2d 250, 260 (2022) (holding the combined testimony between the prospective custodian and the social worker showed the custodian "understood the legal significance of the placement and had adequate resources to care appropriately for the child" despite the lack of any specific findings).

Specifically, Respondent-Mother argues Findings 8 and 25 were general and did not involve actual consequences or resources. These two findings say,

> 8. The juvenile, [Ruth], is placed with her paternal aunt, Angela Heggins, in Spencer. Ms. Heggins has been taking good care of the juvenile. The juvenile is doing well in her home. Angela Heggins is specifically approved to continue to provide care for [Ruth]. She has demonstrated for more than six months that she has the ability to provide for the juvenile's needs. She desires to be the permanent

- 19 -

custodian of [Ruth].

> 25. Information regarding the placement(s) the juvenile has had is contained in the social worker's report, the GAL's report, and the prior court orders. The juvenile's current placement with Angela Heggins is appropriate and should continue.

The trial court is not required to make any specific findings about the verification. *See J.D.M.-J.*, 260 N.C. App. at 65, S.E.2d at 761. Still, the findings are supported by competent evidence. In addition to the financial and material necessities to which Ms. Heggins and the social worker testified, Ruth is on a waitlist for the Center for Emotional Health, has been receiving routine medical and dental treatment, and has been working with Ms. Heggins to "improve her behaviors in and out of the home." Ms. Heggins also testified that she would be willing to be Ruth's custodian until she reaches age eighteen. Thus, Findings 8 and 25 are supported by competent evidence.

### 2. *N.C. Gen. Stat. § 7B-906.2*

Respondent-Mother argues Findings 18, 19, 20, and 21 addressed subsection 7B-906.2(d) and were not supported by the evidence. N.C. Gen. Stat. § 7B-906.2 details necessary findings for concurrent planning at permanency placement hearings. N.C. Gen. Stat. § 7B-906.2 (2025). Subsection 7B-906.2(d) states that "[a]t any permanency planning hearing under subsections (b) and (c) of this section, the court shall make written findings . . . which shall demonstrate the degree of success or failure toward reunification" and lists four factors. N.C. Gen. Stat. § 7B-906.2(d)

(2025).  This subsection, however, is inapplicable here.  Subsection 7B-906.2(b) pertains to "any permanency planning hearing where the court is ordering reunification as a permanent plan."  N.C. Gen. Stat. § 7B-906.2(b) (2025).  Subsection 7B-906.2(c), similarly, applies "[u]nless reunification efforts were previously ceased."  N.C. Gen. Stat. § 7B-906.2(c) (2025).  "The finding that reunification efforts clearly would be unsuccessful or inconsistent with the juvenile's health or safety may be made at any permanency planning hearing, and if made, shall eliminate reunification as a plan."  N.C. Gen. Stat. § 7B-906.2(b).  The trial court found such in the 5 March 2025 permanency planning order:

> 15. At this time, efforts to reunite the juvenile with the Respondent Parents would be clearly unsuccessful or inconsistent with the juvenile's health and safety and need for a safe, permanent home within a reasonable period of time.

Therefore, at the hearing for the order on appeal on 23 July 2025, reunification was not a permanent plan option for Ruth.  Subsections 7B-906.2(b), (c), and (d) are not applicable.

Respondent-Mother further argues that Findings 5 and 26 are inconsistent with the conclusions and decree of the order on appeal because reunification efforts were ended in the 5 March 2025 order and "[t]he movement was towards Ms. Heggins receiving custody of Ruth or the ability to adopt Ruth, or, perhaps, become her guardian."  These findings say,

> 5. The Iredell County Department of Social Services

("DSS") has made reasonable efforts to reunify and to eliminate the need for placement of the juvenile outside of the juvenile's own home and should continue to do so. Said efforts are as described in the social worker's report and the prior court orders.

26. The goals of the juvenile's foster care plan include, but are not limited to, providing the juvenile with a safe, nurturing environment in which to reside while the Respondent Parents are working to rectify the issues that caused the juvenile to enter the purview of the court and foster care and until such time as permanency can be achieved. The juvenile's current placement provider will be consulted about the juvenile's ongoing needs and the placement provider's desire and ability to provide permanency for the juvenile. Further, the placement provider will be involved in transitioning the juvenile towards permanency.

Finding of Fact 26 appears to be referring to Chip as the trial court's order was in relation to both Chip and Ruth, but only Chip is referred to in the order in relation to foster care in Finding of Fact 28 and decree 2.c. Even though the trial court should have been clearer in who it was referring to regarding foster care, the order never refers to Ruth in relation to foster care where the juveniles' names are mentioned. Thus, since our review in this appeal is solely regarding Ruth, we end our review of Finding 26 there.

Respondent-Mother is correct Finding 5 conflicts with Finding of Fact 15, Conclusion of Law 2, decree 2.c pertaining to Ruth, and decree g pertaining to Chip; therefore, this cannot be related to Chip as Finding 26 is. Despite this inconsistency, Finding 5 is not necessary to support the trial court's determination because, as

Respondent-Mother notes, Conclusion of Law 3 of the 5 March 2025 order relieved the need for DSS to make reasonable effort to reunify and eliminate the need for placement of Ruth outside her own home prior to the order on appeal. As noted, reunification was no longer an option and thus could not be continued. *See* N.C. Gen. Stat. § 7B-906.2(b) ("Reunification shall be a primary or secondary plan unless the court . . . previously made written findings under G.S. 7B-906.1(d)(3), the permanent plan is or has been achieved, or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. The finding that reunification efforts clearly would be unsuccessful or inconsistent with the juvenile's health or safety may be made at any permanency planning hearing, and if made, shall eliminate reunification as a plan.").

Moreover, notwithstanding the inconsistency and issues with Finding 5, the trial court still made findings sufficient to support Conclusion of Law 2's ending–again–the efforts for reunification in its findings of fact, such as in Findings 15, 16, and 17. *See* N.C. Gen. Stat. § 7B-906.2(b). Accordingly, because Finding 5 or Finding 26 are not necessary or relevant, respectively, and other findings of fact are sufficient to support the trial court's order, we need not further review either finding. *In re J.N.J.*, 286 N.C. App. 599, 605, 881 S.E.2d 890, 895–96 (2022) (stating "we do not review challenged findings that are unnecessary to support a trial court's determination" in an appeal from adjudication and disposition (citation omitted)).

### 3. *Ruth's Best Interests*

Respondent-Mother argues that it is not in Ruth's best interest to be in the custody of Ms. Heggins because Ruth enjoys interacting with Respondent-Mother and "her emotional and mental health benefits from her connection to [Respondent-Mother]." "We review a trial court's determination as to the best interest of the child for an abuse of discretion." *In re J.K.*, 253 N.C. App. 57, 60, 799 S.E.2d 439, 441 (2017). "An abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re K.P.*, 383 N.C. at 302, 881 S.E.2d at 256 (citation omitted).

As articulated above, Findings 8 and 17 are both supported by competent evidence. Finding 8 states that Ruth "is doing well in [Ms. Heggins's] home." Ms. Heggins has regular contact with Ruth's teachers, Ruth attends routine medical and dental appointments, and Ruth is attending therapy. Moreover, Ruth "likes to be under [Ms. Heggins]" and "looks for [Ms. Heggins] for certain things and assistance." Respondent-Mother has continued therapy, maintained employment, and attended supervised visits with Ruth. Despite these improvements, Finding 17, which is supported by competent evidence as addressed above, dictates "[a]ll of the same issues that were present when the juveniles were adjudicated neglected continue to exist." Moreover, during Ruth's trial home placement with Respondent-Mother, Respondent-Mother allowed Ruth to have unsupervised visits with family members that were precluded by the trial court; she allowed a convicted felon to reside in her

home; and she drove Ruth, while impaired, to Ms. Heggins's home, started an argument, and damaged property.

The trial court's ruling that it is in Ruth's best interest to be in the custody of Ms. Heggins is neither manifestly unsupported by reason nor so arbitrary that it could not have resulted from a reasonable decision. Therefore, it is not an abuse of discretion.

## B. Visitation Plan

Respondent-Mother next argues, "[t]he provisions for visitation between [Respondent-]Mother and Ruth were not supported by the findings of evidence" and "[t]he visitation plan was contrary to the best interests of Ruth, and it was an abuse of discretion." We review the visitation plan for abuse of discretion. *In re A.J.L.H.*, 384 N.C. 45, 57, 884 S.E.2d 687, 695 (2023); *In re S.H.*, --- N.C. App. ----, ----, 929 S.E.2d 75, ----, 2026 WL 763825, at *4 (N.C. Ct. App. Mar. 18, 2026) ("A trial court's order regarding visitation rights is reviewed for an abuse of discretion." (quoting *In re R.J.P.*, 284 N.C. App. 53, 60, 875 S.E.2d 1, 6 (2022))). Thus, "we defer to the trial court's decision unless it is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *A.J.L.H.*, 384 N.C. at 57, 884 S.E.2d at 695 (quoting *In re K.N.L.P.*, 380 N.C. 756, 759, 869 S.E.2d 643, 646 (2022)). "Although the court has broad discretion in selecting an appropriate visitation arrangement, the exercise of the discretion must be supported by findings of fact and evidence along with conclusions of law." *S.H.*, --- N.C. App. at ----, 929

S.E.2d at ----, 2026 WL 763825, at \*4 (citing *Lamond v. Mahoney*, 159 N.C. App. 400, 407–08, 583 S.E.2d 656, 661 (2003)); *see Peters v. Pennington*, 210 N.C. App. 1, 12, 707 S.E.2d 724, 733 (2011) ("[W]e ascertain (1) whether the challenged findings of fact are supported by substantial evidence; (2) whether the trial court's findings of fact support its conclusions of law; and (3) whether the trial court abused its discretion in fashioning the custody and visitation order.").

N.C. Gen. Stat. § 7B-905.1 prescribes a visitation order "shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation[;]" "[t]he court may specify in the order conditions under which visitation may be suspended[;]" and, relevant here, "[i]f the juvenile is placed or continued in the custody or guardianship of a relative or other suitable person, any order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised." N.C. Gen. Stat. § 7B-905.1(a), (c) (2025).

Respondent-Mother specifically argues the trial court's findings "did not explain how the visitation schedule was in Ruth's best interest[;]" "[n]o specific conclusion was in Ruth's best interest[;]" "the evidence did not support the visitation schedule based on the past as opposed to [Respondent-]Mother's and Ruth's therapy and their adjustment to current circumstances[;]" "the finding and the evidence did not address [Respondent-Mother's payment for supervision[;]" and the trial court

improperly delegated its judicial function because the order "places the discretion of visits outside of Pharos Parenting with Ms. Heggins."

### 1. *Ruth's Best Interest*

First, Respondent-Mother argues the visitation schedule is not in Ruth's best interest. "[T]he court must be controlled by the principle that the best interest and welfare of the child is the paramount consideration in determining the visitation rights." *In re Custody of Stancil*, 10 N.C. App. 545, 552, 179 S.E.2d 844, 849 (1971); *see* N.C. Gen. Stat. § 7B-905.1. We review the trial court's determination as to the best interest of the child for an abuse of discretion, *J.K.*, 253 N.C. App. at 60, 799 S.E.2d at 441, and will not reverse its ruling unless it "is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision," *In re K.P.*, 383 N.C. at 302, 881 S.E.2d at 256.

Respondent-Mother argues that the visits are "appropriate," and Ruth enjoys her time with Respondent-Mother. She contends that the new visitation plan indicates that Respondent-Mother will be able to "visit less often" because there is additional coordination involved. The GAL report on 24 June 2025 states that Respondent-Mother "loves her children more than anything in the world." Respondent-Mother and Ruth "work on math and spelling" and Respondent-Mother brings blankets, toys, and dinner. Moreover, Ruth "struggle[s] with leaving the room" after visits with Respondent-Mother and continues to cry until Respondent-Mother is out of eyesight.

However, Ruth is characterized as a "sweet little girl [who is] almost always happy." Ruth is "doing well in [Ms. Heggins's] home." Both the frequency and length of the current visitation plan are the same as the visitation plan from the 5 March 2025 order. Ms. Heggins testified that she would be willing to take Ruth to Pharos or to another person for a supervised visit on a monthly or weekly basis. Moreover, Respondent-Mother and Ruth have continued to visit weekly while Ruth has been under Ms. Heggins's care.

Therefore, the visitation order is neither manifestly unsupported by reason nor so arbitrary that it could not have been the result of a reasoned decision as to Ruth's best interest. *See K.P.*, 383 N.C. at 302, 881 S.E.2d at 256. We cannot say the trial court abused its discretion.

### 2. *Statutory Requirements and Judicial Function*

Second, Respondent-Mother argues the findings did not support the provisions for visitation between Respondent-Mother and Ruth. In support of her argument, Respondent-Mother relies on *In re Custody of Stancil*, which held that where the trial court does not find that "the parent has by conduct forfeited the right of visitation and does not find that the exercise of the right would be detrimental to the best interest and welfare of the child," as in this case, "the court should safeguard the parent's visitation rights by a provision in the order defining and establishing the time, place and conditions under which such visitation rights may be exercised." *Custody of Stancil*, 10 N.C. App. at 552, 179 S.E.2d at 849.

In reliance on *In re Custody of Stancil*, this Court concluded in *In re E.C.* that "[a]n appropriate visitation plan must provide for a minimum outline of visitation, such as the *time, place, and conditions* under which visitation may be exercised." *In re E.C.*, 174 N.C. App. 517, 523, 621 S.E.2d 647, 652 (2005) (emphasis added) (citation omitted). This requirement, however, was abrogated "to the extent that it holds that a trial court *must* provide for the time, place, and conditions of visitation in an order allowing visitation" after a new statute governing visitation was enacted, N.C. Gen. Stat. § 7B-905.1(b), (c). *In re N.B.*, 240 N.C. App. 353, 364, 771 S.E.2d 562, 569–70 (2015).

N.C. Gen. Stat. § 7B-905.1(c) dictates that, "if the juvenile is placed or continued in the custody or guardianship of a relative or other suitable person, any order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised." N.C. Gen. Stat. § 7B-905.1(c) (2025). Respondent-Mother admits that the "[t]rial court included the frequency and the length of the visits and the requirement of supervision" in the order. Moreover, the order in this case is similar to others where we have determined that the minimum statutory requirements were met. *See N.B.*, 240 N.C. App. at 365, 771 S.E.2d at 570 (holding that an order that established at least one supervised visitation session per month for a minimum of one hour met the minimum requirements for visitation, despite appointments being scheduled monthly).

Therefore, the visitation order in this case complies with the minimum statutory requirements of N.C. Gen. Stat. § 7B-906.1(c).

Respondent-Mother also argues that additional conditions on the ability to visit, specifically regarding supervision, improperly delegated the court's judicial function. "[W]hen visitation rights are awarded, it is the exercise of a judicial function." *Custody of Stancil*, 10 N.C. App. at 552, 179 S.E.2d at 849. The trial court may not delegate the judicial function of awarding visitation to a child's custodian. *In re C.S.L.B.*, 254 N.C. App. 395, 399, 829 S.E.2d 492, 495 (2017); *see In re J.D.R.*, 239 N.C. App. 63, 75, 768 S.E.2d 172, 180 (2015). "To give the custodian of the child authority to decide when, where and under what circumstances a parent may visit his or her child could result in a complete denial of the right." *Custody of Stancil*, 10 N.C. App. at 552, 179 S.E.2d at 849.

Respondent-Mother relies on several of this Court's cases in support of her argument. In *In re A.P.*, the trial court mandated that visits would take place at a location of the father's choosing, supervised by the father or someone he approves. *In re A.P.*, 281 N.C. App. 347, 359, 868 S.E.2d 692, 701 (2022). This Court vacated the visitation order because it allowed the father "the sole discretion to decide where and by whom [the mother] would be supervised" during visitation. *Id.* at 361, 868 S.E.2d at 702. Unlike *In re A.P.*, the trial court in this case defined alternative options for visitation: "supervised by Pharos at [Respondent-Mother's] cost or by someone approved by [Ms. Heggins]." The trial court mandated the frequency and length of

the visits to be two hours, once per week. Ms. Heggins has no authority to change either of those conditions. Instead, Ms. Heggins only has discretion if Respondent-Mother chooses to forego the Pharos option.

In *In re J.D.R.*, this Court found that the trial court "impermissibly delegated its judicial function" when the father was able to determine whether the mother had complied with the trial court's directives, such as the provision of negative drug tests, and gave the father substantial discretion over the "kinds of visitation" (such as lunch at school) and future, conditional expansion. *J.D.R.*, 239 N.C. App. at 75–76, 768 S.E.2d at 179–80. Here, Ms. Heggins has no discretion to either alter or expand the "kind" of visitation. The trial court mandates that the visits will be supervised.

Finally, in *In re C.S.L.B.*, this Court vacated a visitation order because it allowed the guardians to "unilaterally modify" visitation based on their "concerns" about the mother's substance abuse or possible discord during the visit. *C.S.L.B.*, 254 N.C. App. at 400, 829 S.E.2d at 495. In this case, Ms. Heggins does not have the authority to suspend visits based on general "concern." Instead, Ms. Heggins can end an individual visit if Respondent-Mother presents as "visibly impaired or otherwise behaves in a manner that presents a danger to the juvenile or is visibly upsetting to the juvenile." Therefore, unlike *In re C.S.L.B.*, her authority is confined to limited circumstances.

In sum, the discretion afforded to Ms. Heggins is both limited in scope and an alternative to an option entirely within Respondent-Mother's control. Therefore, it does not improperly delegate the court's judicial function to the custodian.

### 3. *Cost of Visitation*

Third, Respondent-Mother contends that the findings and evidence do not address her required payment of supervision. While the trial court has adhered to the statutory requirements of N.C. Gen. Stat. § 7B-905.1(c), our Supreme Court has stated that without findings of "whether [the] respondent mother [is] able to pay for supervised visitation once ordered[,]" we are "unable to determine if the trial court abused its discretion by requiring as a condition of visitation that visits with the children be at [the] respondent[-]mother's expense." *In re J.C.,* 368 N.C. 89, 89, 772 S.E.2d 465, 465 (2015); *see also In re Y.I.,* 262 N.C. App. 575, 582, 822 S.E.2d 501, 505–06 (2018) (vacating the portion of the permanency planning order and remanding for additional findings of fact where the trial court intended for the respondent-mother to bear the cost of visitation but failed to determine whether she could pay).

In this case, while the evidence may support such a conclusion, the trial court does not make a finding of fact regarding whether Respondent-Mother had the ability to pay. Accordingly, we vacate the portion of the order requiring supervised visits by Pharos "at [Respondent-Mother's] cost" and remand for additional findings of fact addressing whether Respondent-Mother has the ability to pay those costs.

### 4. *Finding of Fact 24*

Fourth, Respondent-Mother argues Finding 24 "d[oes] not reflect any change the evidence showed." "[T]he trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *In re L.R.L.B.*, 377 N.C. at 315, 857 S.E.2d at 111. "The court may consider any evidence . . . that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen. Stat. § 7B-906.1(c). Moreover, "[t]he trial judge's decisions as to the weight and credibility of the evidence, and the inferences drawn from the evidence are not subject to appellate review." *In re D.W.P*, 373 N.C. 327, 330, 838 S.E.2d 396, 400 (2020) (citation omitted). "Unchallenged findings of fact are also binding on appeal." *In re H.R.P.*, 297 N.C. App. 339, 344, 910 S.E.2d 738, 743 (2024) (internal citation omitted).

The GAL report on 24 June 2025 stated visits with Ruth are "appropriate," and Respondent-Mother brings toys, blankets, and food for Ruth. Ruth "struggle[s] with leaving the room" after visits with Respondent-Mother and continues to cry until Respondent-Mother is out of eyesight. Finding 19, however, which is uncontested and therefore binding on appeal, states that Respondent-Mother "is not actively participating in or cooperating with the plan, DSS, and the GAL for the juveniles." *See id.* While the evidence may conflict, the trial judge's decisions as to the weight and credibility of the evidence are not subject to appellate review. *See D.W.P*, 373 N.C. at 330, 838 S.E.2d at 400. Therefore, there is competent evidence to support Finding 24.

### III.    Conclusion

For the foregoing reasons, we affirm the trial court's order in part, vacate the portion of the order requiring supervised visits by Pharos at Respondent-Mother's cost, and remand for additional findings of fact addressing whether Respondent-Mother has the ability to pay those costs and for correction of the clerical error in Finding 23.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judges TYSON and ARROWOOD concur.

Report per Rule 30(e).